*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| SARAH A., | ) |
| | ) Supreme Court No. S-16880 |
| Appellant, | ) |
| | ) Superior Court No. 3HO-15-00021 CN |
| v. | ) |
| | ) O P I N I O N |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF HEALTH & SOCIAL SERVICES, | ) No. 7305 – September 28, 2018 |
| OFFICE OF CHILDREN'S SERVICES, | ) |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Homer, Charles T. Huguelet, Judge.

Appearances: Renee McFarland, Assistant Public Defender and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

WINFREE, Justice.

## I.    INTRODUCTION

A mother appeals the termination of her parental rights to her son. The mother challenges none of the superior court's factual findings; she rather alleges that the court violated her due process rights during the termination trial by: (1) prejudging

the case; (2) improperly assuming the role of a prosecutor while examining witnesses; and (3) relying on research and evidence outside the record to impeach witnesses and disregard testimony favorable to her. Asserting that the court's actions deprived her of the right to an impartial decision-maker and amounted to structural error, she seeks reversal and remand before a different judge. Although we agree that the court took inappropriate action with respect to witness testimony and other evidence regarding one issue at the trial, we conclude that this does not amount to structural error and that it does not otherwise undercut the unrelated findings supporting the termination of the mother's parental rights. We therefore affirm the superior court's decision.

## II. FACTS AND PROCEEDINGS

Sarah A. and Johnny P. are the parents of Moe, who was eight years old at the time of his removal.[1] Sarah and Johnny were married and continued to reside together at the time of trial. The couple has struggled with domestic violence, mental illness, and severe substance abuse issues, including the use of methamphetamines and opioids. The Office of Children's Services (OCS) first became involved with the family after it began receiving reports in late 2014 that Moe repeatedly arrived at school with unexplained injuries. In August 2015 Sarah and Johnny both were arrested on assault charges after a domestic violence incident in the home, prompting OCS to file an emergency petition for temporary custody of Moe as a child in need of aid.[2] It is unnecessary at this point to describe the next year of OCS's interaction with the family.

OCS petitioned to terminate Sarah's and Johnny's parental rights in September 2016, alleging Moe was a child in need of aid under AS 47.10.011

---

[1]     We use pseudonyms to protect the parties' privacy.

[2]     *See* AS 47.10.011 (enumerating instances where "court may find a child to be a child in need of aid"); CINA Rule 6(b) (providing procedural structure for petitions for emergency custody with court order for child in need of aid).

(1) (abandonment), (8) (mental injury), (9) (neglect), and (10) (parental substance abuse).[3] OCS alleged that the parents' struggles with substance abuse, mental illness, and domestic violence were ongoing and that "the parents have triangulated providers . . . with different information," making it "extremely difficult to assess for progress and elimination of safety threats."

The termination trial took place over the course of three days. After two days of trial in May 2017, the trial was continued to July.

**May 2017 Trial Proceedings**

Because Sarah contends on appeal that the superior court prejudged the case after the first two days, we detail the relevant testimony and exchanges.

Kathryn Carsow, Sarah's psychotherapist, testified that Sarah attended therapy inconsistently. Given discrepancies between Sarah's reports and information from OCS, Carsow felt Sarah often was not honest about her substance use. Carsow stated that Sarah was open to intensive outpatient treatment, but less so to residential treatment. Carsow also reported that she and Sarah "made no progress" in addressing domestic violence issues, describing an incident in which Johnny, during a methamphetamine withdrawal, threw furniture and nearly strangled Sarah with an electrical cord. Carsow also reported that Sarah misused taxi vouchers by requesting a voucher for an appointment, then not attending the appointment or not actually having an appointment, or requesting a voucher when she already had one from another provider.

OCS caseworker Jocelyn Maneval characterized the parents' "deception" as "a global concern"; she testified that the parents were "not being forthright" and were

---

[3]     *See* AS 47.10.080(c)(3) (authorizing termination of parental rights to child in need of aid upon satisfaction of statutory conditions).

unwilling "to really commit to engaging in the services that were being offered and provided." Maneval reported that the parents "essentially faked" their urinalysis (UA) tests and that OCS had difficulty getting them to attend meetings or engage in substance abuse assessments. According to Maneval, Sarah missed drug tests and under-reported her substance abuse history, denying use even when she tested positive.

Maneval also observed "denial about [domestic violence] being a concern in the relationship." She listed ongoing domestic violence reports after OCS became involved: following a November 2015 meeting with OCS, Sarah and Johnny had a physical altercation, and the next day he showed up to group therapy alone, with visible injuries on his face; and in February 2016 Johnny choked Sarah with an electrical cord and banged her head against the floor. Maneval remarked upon the extent of the parents' denial: "[I]t was as if unless the police were called, [domestic violence] didn't occur."

OCS protective services specialist Alicia Kupczyk-Gregory testified about numerous times Sarah deceived OCS or service providers, remarking on her lack of honesty and noting "there appears to be a pattern of the parents putting a lot of effort into making things seem like they're okay when they are not." When managing Sarah's UA testing, Kupczyk-Gregory observed suspicious behavior causing her concern that Sarah's UA tests were faked. In November 2016 Sarah refused to complete a UA test for OCS, claiming she was doing one later that day for a treating physician. Sarah misled Kupczyk-Gregory to believe her UA tests with other providers were observed when they were not.

Kupczyk-Gregory testified that Sarah said she had been accepted to residential treatment and wanted to see Moe before she departed, so OCS facilitated an "off-the-books" visit; she did not enter any treatment, and OCS later received a denial letter from the residential program. Kupczyk-Gregory noted that Sarah took "a very long time" to complete the process for entering residential treatment. In February 2017

Sarah misled an assessor, stating that she was receiving counseling services even though she had terminated her sessions with Carsow.

The superior court interjected during Kupczyk-Gregory's testimony, asking why the termination petition was filed less than a year into the case and remarking that it was "really unusual." Kupczyk-Gregory responded that Moe needed permanency and that the parents were not engaging with services.

Dr. Sarah Spencer, Sarah's treating physician, testified that Sarah had made significant progress since June 2016, when "she was taking benzodiazepines . . . and using heroin and methamphetamines." Dr. Spencer saw a "huge turnaround" in September 2016, and she noted that "the only [positive substance test] in the last six months other than her prescription medications was THC." Dr. Spencer explained that, because polysubstance abuse is common, her program does not require participants to abstain from marijuana; rather, the focus is treating opioid use while "working towards abstinence from all intoxicating substances." Dr. Spencer also testified she learned from OCS that Sarah had tested positive for methamphetamine at the end of April 2017 and that she had missed her UA appointment three weeks before the termination trial.

The superior court asked Dr. Spencer about her marijuana policy, remarking that documents showed Sarah "had been using it daily for more than 25 years. And you're not addressing that at all?" Dr. Spencer responded that she encourages her patients to reduce use and gradually become abstinent. The court also requested clarification about whether Dr. Spencer was treating Sarah for alcohol, cannabis, or domestic violence, to which Dr. Spencer responded: "We monitor all substance use, but we're not specifically treating for anything other than opioids."

At the end of the first two days of trial, the superior court summarized its "impression so far" that both parents had a pattern of evading UA tests, and the court requested to see at the next hearing "a list of all UA's chronological, the results, and

those that were scheduled and missed." The court observed that Sarah in particular tended to "evade and obfuscate and dodge," exhibiting a pattern of "looking for something that's easier than what is prescribed."

The superior court made it clear to both Sarah and OCS that she needed to do another intake and get mental health services, remarking: "If you're asking me to turn a child over to someone with that kind of Axis I diagnosis and no treatment, you know, that ain't going to happen." The court urged an end to Sarah's "therapist-shopping, doctor-shopping, program-shopping" and noted: "It usually doesn't take with people who are motivated . . . a year to get to . . . residential treatment." Acknowledging that manipulation and dishonesty about use are often part of addiction, the court indicated that while it awaited Sarah's testimony at the next hearing, she needed to begin treatment in earnest, "regardless of what happens." The court also emphasized that Sarah's drug test needed to show up clean for both marijuana and methamphetamine: "[M]arijuana is not clean and sober especially when someone has a severe disorder, especially when someone says they've been using it everyday starting in the morning since age 15."

The superior court also had strong words for OCS, remarking: "I don't know that I've ever seen a petition filed this quickly . . . . [U]sually we try a little bit longer to fix people before we give up, and I'm not certain that I know the exact reasons for that from the testimony I've heard." OCS later asked if the court's impression was that "OCS gave up," to which the court responded: "I understand that you haven't stopped providing services . . . . [Y]ou didn't say stay out of my office, go away, but they filed the petition quicker than I've seen in any Homer case anyway."

**July 2017 Trial Proceedings**

Sarah also claims on appeal that on the final day of trial, during the testimony of Dr. Spencer and an OCS case manager, the superior court assumed the role of a prosecutor and improperly relied on personal experience and evidence outside the record. Each exchange is set forth below.

**Dr. Spencer**

Dr. Spencer testified that, in the previous month, Sarah's marijuana use was more regular and that she was using it at consistent times for pain management. Dr. Spencer stated there were no signs Sarah was misusing marijuana and noted there were few other non-narcotic pain management alternatives available to an opioid addict of limited means. The superior court interjected to ask Dr. Spencer about Suboxone's effects when mixed with marijuana. The court stated: "I just did a quick search about marijuana and Suboxone . . . . and it seems to be quite controversial."

Dr. Spencer responded that there is evidence marijuana use is associated with positive outcomes for patients being treated for opioid use disorders and that studies contradicting that view are inconsistent. The court interrupted Dr. Spencer, stating:

> Yeah. I was just concerned in this case, because I've got a document in front of me . . . that diagnosed [Sarah] as having an opioid disorder that was severe and that she – was using – I mean not opioid, marijuana, cannabis – disorder, severe; and she's using it twice a day, marijuana gets you high, and she's got a doctor that's telling her that it's okay. So, if she has a severe cannabis disorder, should she be using cannabis?

Dr. Spencer could not say whether she agreed with the severe cannabis use disorder diagnosis without first reviewing the records. Dr. Spencer noted her credentials and said that Sarah's marijuana use had not "been causing a problem for her" in their interactions. The court then asked: "So, what is causing a problem from taking an intoxicating substance?" Dr. Spencer explained:

[T]he substance has to cause a significant impact on your quality of life in order to have it be diagnosed with substance use disorder. It doesn't – it has very little to do actually with the frequency of use . . . . It has to do with how the substance is affecting your function and your quality of life.

The court responded: "The child's removed. That's how it's affecting."

Dr. Spencer disputed that reasoning, stating she thought it more likely that the "severe dysfunction" and "impairment was – in the past was due to the use of methamphetamines and opioids." The court responded:

Okay. I've just been doing the CINA business for a long time and dealing with substance abuse in the courts for more than 30 years and with children, when they're removed and OCS says you got to stop using substances – and you continue to use substances, I've never seen a child reunited with their parents. And I'm a little concerned here because I've got a medical practitioner that's recommending to continue to use substances, and when I've got the treatment people on the other end . . . saying no and OCS saying no. So, this is very troubling for me.

The court questioned Dr. Spencer about Sarah's pain: "Well, what pain does she have that she needs to smoke marijuana twice a day?" Dr. Spencer explained that Sarah had chronic back pain, congenital foot deformities, and fibromyalgia and listed her medications. The court responded: "[F]or future reference if you've got someone that has an OCS case and they're using marijuana, they're probably not going to get their kids back." Dr. Spencer noted the lack of communication between herself, OCS, and other providers, prompting the court to say: "I want to reunite parents and their children and I don't like to see things get in the way." Dr. Spencer responded: "[M]y job is to take care of patients in . . . the way I think is medically most appropriate for that patient."

**Cross-examination of Jocelyn Maneval**

Sarah's attorney elicited cross-examination testimony from OCS case manager Jocelyn Maneval that Sarah's THC levels had decreased over time. The superior court interjected, stating: "Well, let me stop you there. I'm – practically have a master's degree in drug testing from military. Those numbers – if someone smokes marijuana and has a test the next day, this can – be really, really high."

The court again interrupted the cross-examination, reiterating: "The experts will tell you the pattern is meaningless." Sarah's attorney continued asking Maneval about the pattern, but the court continued interjecting, referring to what the court had learned from expert testimony in a separate marijuana driving under the influence case: "[E]ven the active THC in the blood, the amount of it, doesn't really tell you anything. In Washington they have a presumptive . . . like a five is automatically drunk but the expert from Washington said it doesn't mean anything."

At the end of cross-examining Maneval, Sarah's attorney objected, stating: "I don't know if you're taking judicial notice or what but . . . . without having any information about the information you're relying on . . . we're not able to cross-examine." The court responded: "I don't have any information about what you're relying on either. You're relying on scientific evidence, and you're bringing it out through a social worker." The court then stated: "[Y]ou didn't bring an expert so I'm not relying on your testimony here to show – because that . . . requires expert testimony. And I think if you had an expert, you would not get what you wanted out of it."

**Order Terminating Parental Rights[4]**

The superior court terminated Sarah's and Johnny's parental rights. The court found that Moe "has experienced severe mental and emotional trauma from exposure to domestic violence in his parents' home." The court detailed the injuries Moe suffered while in his parents' care, including frequent unexplained physical injuries, poor school performance due to regular absences, and mental injuries, such as symptoms of generalized anxiety disorder, severe emotional disturbance, and post-traumatic stress

---

[4] Under relevant Alaska Child in Need of Aid (CINA) statutes and rules, parental rights may be terminated at trial only if OCS shows, under Rule 18(c):

(1) by clear and convincing evidence that

(A) the child has been subjected to conduct or conditions described in AS 47.10.011 and

(i) the parent has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or

(ii) the parent has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury;

. . . .

(2) by clear and convincing evidence that

(A) the Department has complied with the provisions of AS 47.10.086 concerning reasonable efforts . . .

(3) by a preponderance of the evidence that termination of parental rights is in the best interests of the child.

CINA Rule 18; *see also* AS 47.10.080.

disorder. The court found the evidence indicated that Moe had significantly improved since living with his grandmother, but he still required therapy.

The superior court found that Moe was subjected to the conduct and conditions described in AS 47.10.011 (8) (mental injury from domestic violence), (10) (parental substance abuse), and (11) (parental mental illness);[5] that his parents had not remedied the conduct or conditions within a reasonable time; and that returning him to the home would place him at substantial risk of physical or mental injury. The court found that Moe already had suffered serious mental injury as a consequence of chronic domestic violence in the home. The court noted that domestic violence led to Moe's removal and that he was "still receiving mental health treatment and has not recovered from injuries caused by his parents." Because the parents had yet to complete a case plan addressing their regular and ongoing domestic violence, the court concluded Moe would continue to suffer if reunified with his parents.

The superior court observed that neither parent had completed case plan requirements with respect to mental health treatment, despite severe diagnoses "that contributed to the conduct that injured [Moe]." The court recognized, but found insufficient, that Sarah was taking medication for her bipolar disorder at the time of trial. The parents' perceived unwillingness to address mental illnesses "that caused or contributed to the substance abuse disorders and chronic domestic violence" further weighed against reunification.

The superior court also found that both Sarah's and Johnny's serious substance abuse disorders "substantially impair their ability to parent." The court questioned the parents' dedication to sobriety for Moe's sake, observing that neither

---

[5]     We note that the petition to terminate parental rights did not list the parents' mental illness as a ground for finding Moe a child in need of aid, but Sarah does not raise this issue on appeal. We therefore do not address the discrepancy.

parent participated in UA testing or residential treatment and that both "frequently lied about the extent of their abuse." Both parents continued to use marijuana, and the court found Suboxone treatment was ineffective in treating either their marijuana use or methamphetamine addiction, noting that Sarah was "engaged in a Suboxone program at the time [Moe] was removed, and it did not appear to have any positive effect on her ability to parent."

Throughout its discussion, the superior court referenced Sarah's dishonesty and unwillingness to engage in treatment. In discussing whether OCS made reasonable efforts and whether those efforts had been successful, the court observed:

> [Sarah] has better contact with OCS [than Johnny], but engaged in a pattern of outright dishonesty, minimizing problems, and using rationalizations and excuses to avoid the hard work it would take for her to recover. She was receiving medications for mental health problems and substance abuse when [Moe] was removed. Nothing changed after removal except that she is seeing a different doctor.

In the order's conclusion, the court expressed similar sentiments:

> [Sarah] engaged in a pattern of manipulation so she did not have to embrace sobriety (Suboxone and marijuana v. inpatient treatment and abstinence) or endure discussions about her distorted thinking patterns (taking medication, but dropping out of therapy) that caused or contributed to the domestic violence that seriously injured her son.

The court found it was in Moe's best interests to live with his grandmother, where he had the "best chance for recovery from the serious mental injuries caused by his parents" and would not be exposed to "unstable adults" who are "intoxicated and engaged in domestic violence."

Sarah appeals.

## III. STANDARD OF REVIEW

"Whether a parent's due process rights were violated in a termination proceeding is a question of law that we review de novo,"[6] adopting "the rule of law that is most persuasive in light of precedent, reason, and policy."[7]

## IV. DISCUSSION

The Alaska Constitution states that "[n]o person shall be deprived of life, liberty, or property, without due process of law."[8] "The crux of due process is [having the] opportunity to be heard and the right to adequately represent one's interests."[9] "A valid constitutional challenge based on due process requires 'state action and the deprivation of an individual interest of sufficient importance to warrant constitutional protection.' "[10]

"Due process under the Alaska Constitution is 'flexible, and the concept should be applied in a manner which is appropriate in the terms of the nature of the proceeding.' "[11] To determine what process is due, we consider the following three factors enunciated by the United States Supreme Court in *Mathews v. Eldridge*:

---

[6] *Alyssa B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 165 P.3d 605, 614 (Alaska 2007) (citing *Jeff A.C., Jr. v. State*, 117 P.3d 697, 702 (Alaska 2005)).

[7] *Dennis O. v. Stephanie O.*, 393 P.3d 401, 405-06 (Alaska 2017) (quoting *Jerry B. v. Sally B.*, 377 P.3d 916, 924-25 (Alaska 2016)).

[8] Alaska Const. art. I, § 7.

[9] *Dennis O.*, 393 P.3d at 406 (alteration in original) (quoting *In re K.L.J.*, 813 P.2d 276, 279 (Alaska 1991)); *Berry v. Berry*, 277 P.3d 771, 774 (Alaska 2012).

[10] *Dennis O.*, 393 P.3d at 406 (quoting *Ostrow v. Higgins*, 722 P.2d 936, 942 (Alaska 1986)).

[11] *Id.* (quoting *In re K.L.J.*, 813 P.2d at 278).

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and, the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[12]

Applying these factors, we consider Sarah's argument that the appearance of judicial partiality violated her due process rights, requiring us to vacate the termination order and remand for proceedings before a different judge.[13]

A.    **First Factor: The Private Interest Affected Is Of The Highest Magnitude And Weighs In Sarah's Favor.**

The private interest at stake in a termination proceeding is significant. It is well established that the interest in the care and custody of one's own child is the most basic of all civil liberties and "a fundamental right recognized by both the federal and state constitutions."[14]  We have held that the interest of a parent facing termination proceedings is "of the highest magnitude" and "clearly falls within the protections of the due process clause."[15]

---

[12]    *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 212 (Alaska 2000) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

[13]    We note that Sarah does not make a claim of judicial bias under Code of Judicial Conduct Canon 3(E)(1), nor did she move to recuse or disqualify the presiding judge at trial.  We therefore limit our discussion to Sarah's due process claim.

[14]    *Dennis O.*, 393 P.3d at 407 (quoting *J.M.R. v. S.T.R.*, 15 P.3d 253, 257 (Alaska 2001)); *see also Alex H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 389 P.3d 35, 49 (Alaska 2017); *Flores v. Flores*, 598 P.2d 893, 895 (Alaska 1979).

[15]    *Dennis O.*, 393 P.3d at 407-08 (first quoting *In re K.L.J.*, 813 P.2d at 279;
(continued...)

To the extent Sarah would have us independently consider an additional private interest — her right to an impartial decision-maker during a termination proceeding — we decline to do so. We agree that parents, like all others who come before a tribunal, enjoy a due process "right to a neutral and unbiased decision-maker who presides over proceedings that are fair and that have the appearance of fairness."[16] We also bear in mind that "[s]ubmission to a fatally biased decisionmaking process is in itself a constitutional inquiry" and "a fair trial in a fair tribunal is a basic requirement of due process."[17] But when considering this first factor, we do not give "separate weight to the various procedural rights independently established under the due process clause," and we instead limit our inquiry "to the significance of the underlying substantive right requiring protection."[18] The substantive right here is the right to parent.[19] The import of perceived judicial partiality is more appropriately considered in the context of the second factor: risk of erroneous deprivation and the probable value of the requested procedural safeguards.

---

[15]    (...continued)
then quoting *Richard B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 71 P.3d 811, 831 (Alaska 2003)).

[16]    *See Copeland v. Ballard*, 210 P.3d 1197, 1201 (Alaska 2009).

[17]    *RBG Bush Planes, LLC v. Kirk*, 340 P.3d 1056, 1066 (Alaska 2015) (alterations in original) (first quoting *United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982); then quoting *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995)).

[18]    *Alex H.*, 389 P.3d at 50.

[19]    *See id.* at 49.

**B.     Second Factor:    The Risk Of Erroneous Deprivation And The Probable Value Of Remand Are Low.**

Sarah argues that any appearance of a lack of judicial impartiality during a termination proceeding is structural error, requiring that we automatically vacate and remand.[20] But Sarah ignores the fact that in the context of termination proceedings, "[n]ot every potential deprivation of protected interests results in a due process

---

[20]     Sarah cites the United States Supreme Court's *Arizona v. Fulminante* decision stating that in criminal cases, "the presence on the bench of a judge who is not impartial" is a structural defect that "def[ies] analysis by 'harmless-error' standards." 499 U.S. 279, 309-10 (1991) (Rehnquist, J., dissenting in part) (citing *Tumey v. Ohio*, 273 U.S. 510 (1927)); *see also Chapman v. California*, 386 U.S. 18 (1967). Sarah urges us to apply the same approach to termination trials because the proceedings are equally tainted by judicial partiality, and a significant fundamental right — the right to parent — is at stake. But we agree with the California Supreme Court that "significant differences between criminal proceedings and [CINA] proceedings provide reason to question whether the structural error doctrine that has been established for certain errors in criminal proceedings should be imported wholesale, or unthinkingly, into the quite different context of [CINA] cases." *In Re James F.*, 174 P.3d 180, 189 (Cal. 2008). And in the past we have not simply stopped our analysis at whether a potential violation of due process occurred. *See Alex H.*, 389 P.3d at 50 (considering how incarcerated parent's inability to attend termination trial may have altered proceeding's outcome); *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 212-13 (Alaska 2000) (considering first "whether lack of notice might deprive a parent of sufficient opportunity to prepare her case" and then, after reviewing record, holding parent "fail[ed] to identify any plausible way she was prejudiced in the termination proceedings").

Sarah's reliance on *Vent v. State* is similarly unavailing. 288 P.3d 752 (Alaska App. 2012). In *Vent* the court of appeals vacated a decision denying an application for post-conviction relief because the superior court's outside research and conduct "created an appearance of partiality." *Id.* at 753. The court of appeals concluded that the court had conducted an inadmissible ex parte investigation that created an appearance of partiality, but, instead of ending its inquiry there, applied a test to determine whether the defendant was substantially prejudiced. *Id.* at 757-58. Sarah's reliance is misplaced, not least because *Vent* is a criminal matter that did *not* treat judicial partiality as structural error requiring automatic reversal.

violation."[21] Although a party need not prove actual prejudice to establish a due process violation, "a theoretical possibility of prejudice is not enough."[22] "[A] court must assess 'the probable value' of [the requested procedure] in reducing the risk that parental rights might be erroneously terminated" and "consider the likelihood that [the requested procedure] might alter the outcome."[23] This inquiry "is not the same as determining whether any constitutional error was harmless, but more fundamentally considers"[24] the effect that the error might have had on a parent's right to "be heard" and "adequately represent [her] interests,"[25] i.e., whether it "deprives the parent of a sufficient opportunity to present a case."[26] We have denied due process claims where a parent failed to identify any "plausible" basis for finding prejudice or did not theorize about how the requested procedural safeguard might "potentially alter[ ] the findings about . . . parental conduct."[27]

For instance, in *Alex H. v. State, Department of Health & Social Services, Office of Children's Services* we addressed an incarcerated father's claim that the superior court violated his due process right to in-person attendance of his parental rights

---

[21] *D.M.*, 995 P.2d at 212.

[22] *Id.*

[23] *Alex H.*, 389 P.3d at 50 (alterations in original) (quoting *D.M.*, 995 P.2d at 212).

[24] *D.M.*, 995 P.2d at 212.

[25] *See In re K.L.J.*, 813 P.2d 276, 279 (Alaska 1991) (quoting *Matanuska Maid, Inc. v. State*, 620 P.2d 182, 192 (Alaska 1980)).

[26] *Alex H.*, 389 P.3d at 50.

[27] *D.M.*, 995 P.2d at 210-11, 213; *see also Dennis O. v. Stephanie O.*, 393 P.3d 401, 409-11 (Alaska 2017); *Alex H.*, 389 P.3d at 50-53.

termination trial by denying his prisoner-transport request and conducting the hearing telephonically.[28]  We noted that "the generic benefits of in-person attendance do not suffice to establish a per se due process right" for prisoner transport to a termination trial, and we stated that to prevail the "prisoner must address the particular issues being determined at the termination trial and identify how in-person attendance would reduce the risk of an erroneous ruling on those issues."[29]  We concluded this second factor weighed against the father because he failed "to demonstrate how his in-person attendance could have altered the outcome of the proceedings or why his telephonic attendance increased the risk that the superior court would reach an erroneous result."[30]

In *Wendell C. II v. State, OCS* we considered whether the superior court violated the due process right to notice by relying upon outside information — social science research not admitted into evidence — as a basis for terminating parental rights.[31]  The parents argued that the studies, detailing the effects of alcoholism and domestic violence on families, could not be judicially noticed because they were subject to reasonable dispute and that the lack of notice was improper and violated their due process rights.[32]  We affirmed the superior court because there was "no reasonable likelihood that the . . . decision to terminate parental rights would have been different absent the social science studies cited in the opinion."[33]  Because the court made "so

---

[28]     389 P.3d at 48-54.

[29]     *Id.* at 51.

[30]     *Id.* at 54.

[31]     118 P.3d 1, 2 (Alaska 2005).

[32]     *Id.* at 3.

[33]     *Id.*

many other specific findings, based on admissible evidence," its citation of academic articles and studies did not require us to vacate the decision.[34]

Turning to Sarah's case, we note that the court found by clear and convincing evidence that Moe was a child in need of aid based on three separate provisions of Alaska law: AS 47.10.011 (8) (mental injury from domestic violence), (10) (parental substance abuse), and (11) (parental mental illness). Sarah challenged none of the findings supporting these grounds for termination, relying entirely on her argument that any appearance of partiality in a termination proceeding is structural error. But her challenge to the court's partiality pertains at most to one ground — substance abuse — not to Sarah herself, and leaves the two other grounds for termination unaffected. One ground alone sufficiently supports a termination order.[35] By failing to challenge the factual findings regarding the other grounds for termination, Sarah neglected to " 'identify any plausible way that [she] was prejudiced' at the hearing."[36] And, as discussed further below, our own review of the record suggests no probability that remand "might alter the outcome."[37]

1. **The superior court did not prejudge Sarah's character or the outcome of the termination proceedings at the trial's midpoint.**

Contrary to Sarah's assertions, the superior court did not "prejudge[] the case" or form a "premature negative opinion" of Sarah's "character and credibility" when, prior to the close of evidence and before she had testified, it shared its impression

---

[34]     *Id.* at 4-5.

[35]     *Alyssa B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 165 P.3d 605, 618 (Alaska 2007).

[36]     *See Dennis O.*, 393 P.3d at 410 (quoting *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 213 (Alaska 2000)).

[37]     *See id.* at 409 (quoting *D.M.*, 995 P.2d at 212).

that she had exhibited a pattern of evasiveness and dishonesty with providers.  The court stated its "impression so far" — not its decision prior to the trial's close.[38]  Although the court referenced Sarah's inclination to "evade and obfuscate and dodge," this statement was not a comment on her character but rather a fair summary of the testimony, which in fact did indicate that she had triangulated service providers.

Multiple witnesses testified to Sarah's level of deception, her denial of substance abuse and domestic violence, and her refusal to enter residential treatment or attend therapy regularly.  Kupczyk-Gregory testified about how Sarah evaded UA testing, misled assessors about services received elsewhere, and misrepresented the status of her application to residential treatment so she could have an off-the-books visit with Moe.  Carsow described Sarah as dishonest, explained that she misused taxi vouchers, and testified to discrepancies between Sarah's and OCS's reports.  Even service providers testifying on Sarah's behalf said she "consistently denied use" of substances

---

[38]     Sarah offers cases from other jurisdictions as examples of prejudgment, but all are more extreme than the superior court's comments here.  In *People v. Johnson* a criminal verdict was overturned because the court "reached a conclusive opinion of [the defendant's] guilt prior to the close of all the evidence" and blatantly remarked, "[t]here will be a finding of guilty" before the final witness took the stand.  281 N.E.2d 451, 452-53 (Ill. App. 1972).  No such declaration occurred here.  In *People v. Jackson* a first-degree murder guilty verdict was overturned when the court "repeatedly referred to the shooting as 'murder' even though the trial had not ended."  949 N.E.2d 215, 231 (Ill. App. 2011).  Finally, in *Crandell v. United States* the Fourth Circuit Court of Appeals concluded the court had prejudged a medical malpractice case in part by disparaging the plaintiffs' case from the start, suggesting plaintiffs were unreasonable in their refusal to settle the suit and making comments about the "possible financial ramifications of the trial [that] were irrelevant to proper deliberation of the issues."  703 F.2d 74, 75-76 (4th Cir. 1983).  The superior court's conduct at the mid-point of Sarah's proceeding did not rise to the level of bias or prejudgment exhibited in these cases:  the court remained undecided on major issues, like whether OCS filed the petition too early, and did not go so far as to demand the equivalent of a settlement or preordain a guilty verdict.

or she had not given them documentation from other providers. Sarah herself later admitted that she had not always been honest with OCS and stated that she "probably" began getting honest with OCS "around . . . September of 2016."

We also observe that the superior court requested observed weekly UA tests between the two hearings and appeared open to hearing Sarah's testimony — actions inconsistent with a foregone conclusion. The court stated that it understood "manipulation of services" and dishonesty are part of addiction but that Sarah "needs to go to somebody" and "regardless of what happens . . . that needs to be fixed" because "[i]f you're asking me to turn a child over to someone with that kind of Axis I diagnosis and no treatment, you know, that ain't going to happen."

Finally, we note that the superior court was balanced in its treatment of the parties.[39] The court addressed OCS, remarking: "[U]sually we try a little bit longer to fix people before we give up, and I'm not certain that I know the exact reasons for that from the testimony I've heard." This concern permeated the hearing; the court questioned OCS mid-testimony about the swiftness of its petition to terminate parental rights, noting the decision was made "well before a year had expired" and asking: "[W]hy that quickly?" Because the record shows the court was balanced in its treatment of the parties and had not reached a final conclusion, we conclude the court did not prejudge Sarah's character or the outcome of the termination trial.[40]

---

[39] *Cf. Kinnan v. Sitka Counseling*, 349 P.3d 153, 155, 161 (Alaska 2015) (concluding there was no appearance of bias because court overruled certain evidentiary objections and "expressly noted" evidence favorable to party alleging prejudgment).

[40] *See id.*

## 2. Any perceived partiality related to only one of three distinct termination grounds and would not have changed the outcome.

According to Sarah, the superior court's rigorous, persistent, and extensive interrogation of Dr. Spencer was that of a prosecutor, not a dispassionate or impartial jurist, and the court exceeded its discretion to examine witnesses. Sarah asserts that the court's interruption of her cross-examination of Maneval regarding THC levels was both hostile and improper, particularly the court's refusal to provide a basis for its knowledge. Sarah also contends that throughout the hearing the court "improperly relied on outside knowledge regarding the proper treatment of pain in an opiate-addicted patient" and disregarded evidence favorable to her.

We are disturbed by the superior court's conduct, particularly its highly inappropriate "quick search" for information not presented as evidence and its reliance on other cases' experts. The court apparently exceeded the bounds of judicial notice,[41]

---

[41] Alaska Code of Judicial Conduct Canon 3(B)(12) provides that "[w]ithout prior notice to the parties and an opportunity to respond, a judge shall not engage in independent ex parte investigation of the facts of a case." Canon 3(B)(12) makes an exception for judicial notice of fact, permitted under Alaska Evidence Rule 201(a). Rule 201(b) clarifies that a court may take judicial notice of a fact so long as it is "not subject to reasonable dispute in that it is either (1) generally known within this state or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

The superior court's references to personal knowledge and facts outside of evidence do not fall within this sheltered category. Sarah had no notice of the court's "quick search" about the interaction of Suboxone and marijuana, nor could she cross-examine the expert testimony from the driving under the influence case or the military drug-testing experience the court referenced. Although not referenced in its decision, the court's statements during trial gave the appearance of partiality and seemingly foreclosed the possibility of concluding that Sarah had remedied her substance abuse.

and likely abused its discretion to examine witnesses.[42]  We disapprove of this conduct, as the appearance of partiality does violence to the integrity of the justice system.

But we note that the superior court at most demonstrated lack of impartiality as it related only to one ground for terminating parental rights:  that Sarah's substance abuse substantially impairs her ability to parent.  The exchanges that she contests all exclusively concern her failure to achieve full sobriety.  Although these exchanges may be enough to draw the court's substance abuse findings into question, Sarah has made no argument that the court's remaining grounds for termination — that Moe is a child in need of aid because he has suffered mental injury as a result of

---

[42]  Alaska Evidence Rule 614 authorizes courts to call or examine any witness. Rule 614(b)'s commentary notes it is well-established that a court may interrogate any witnesses, but emphasizes "[i]n trials before a jury . . . the court's questioning should be cautiously guarded so as not to constitute an implied comment."  To that end, "the court abuses its authority when it plays the part of the advocate."  The commentary recognizes that "the manner in which interrogation should be conducted and the proper extent of its exercise are not susceptible of formulation in a rule" and clarifies that appellate courts may reverse for abuse of discretion.  Assessing whether the superior court improperly assumed an advocate's role, this court has looked to whether the judge's "tone or demeanor during [the] exchange . . . exhibited bias."  *Kinnan*, 349 P.3d at 161. Questioning exceeds Rule 614(b)'s boundaries if the court "communicate[s] a bias against [the witness] to the jury" or "suggest[s] in any manner that [the court] did not believe [the witness]."  *Hartley v. State*, 653 P.2d 1052, 1053 n.1 (Alaska App. 1982).

The superior court here was hostile to Dr. Spencer, discounting her testimony about Sarah's progress and giving the appearance that the court personally disagreed with Dr. Spencer's medical decision to focus on her patients' opiate addiction rather than their marijuana use.  The court's questioning of Dr. Spencer went on for several minutes, and the court's tone was argumentative, near prosecutorial, throughout. The court's tone and demeanor were also argumentative during Sarah's cross-examination of Maneval, when the court interjected to say:  "[w]ell, let me stop you there.  I'm – practically have a master's degree in drug testing from military.  Those numbers – if someone smokes marijuana and has a test the next day, this can – be really, really high."  We do not condone such conduct.

exposure to domestic violence and because her mental illness places him at substantial risk of physical harm or mental injury — were plausibly tainted by the court's perceived lack of impartiality. One finding alone is sufficient to support the termination order.[43] Because Sarah does not challenge the domestic violence or mental illness grounds for termination, we conclude that the court's conduct underlying the substance abuse finding has "no impact on the outcome of the case."[44]

The record confirms our conclusion that there is little risk of erroneous deprivation of Sarah's parental rights and that the probable value of remand is low. This second factor does not weigh in Sarah's favor.

## C. Third Factor: The State's Interests Weigh Against Sarah.

The State has articulated an interest in promoting "the child's welfare and the parents' participation in the upbringing of the child to the fullest extent consistent with the child's best interests."[45] In the context of CINA proceedings, this includes an interest in assuring "fairness, accurate fact-finding, the expeditious determination of children's matters, and the best interests of the child."[46] It is clear that the State "shares the parent's interest in an accurate and just decision."[47] However, because permanency is also in the child's best interests, the unnecessary "lengthening of judicial procedures"

---

[43] *Alyssa B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 165 P.3d 605, 618 (Alaska 2007).

[44] *Id.*; *see also Alex H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 389 P.3d 35, 52 (Alaska 2017) (holding that "single instance of possible judicial interference does not demonstrate that [the requested procedural safeguard] would have reduced the risk of erroneous deprivation").

[45] AS 47.10.005(1).

[46] CINA Rule 1(c).

[47] *In re K.L.J.*, 813 P.2d 276, 280 (Alaska 1991).

may pose fiscal and administrative burdens that run counter to the child's best interests.[48]

OCS argues that a court's inability to "explore inconsistencies in witness testimony or clarify its understanding" would "burden [OCS's] interest in making a fair and accurate decision by decreasing the court's understanding of the facts." We agree, but that is not the scenario before us. It is difficult to see how OCS's interest in fairness and accurate fact-finding would be served by affirming the decision of a court that openly relied upon extrajudicial facts, adopted the role of a hostile advocate, and gave the appearance of partiality whether against the parent or OCS. A court can question witnesses for the purpose of finding facts without taking on the role of an advocate by moderating its tone and demeanor and providing fair opportunities for cross-examination.

Far more compelling are the State's interests in fostering the child's best interests and avoiding the administrative and fiscal costs of lengthening judicial proceedings. While in Sarah's household, Moe suffered mental injury as a result of exposure to his parents' chronic domestic violence, manifestations of mental illness, and substance abuse. Moe is finally improving in his grandmother's care: he is better adjusted socially, his school attendance and performance have improved, and he displays fewer symptoms of anxiety. He was removed from his parents' care three years ago, in 2015. Remand at this juncture would create a fiscal and administrative burden inconsistent with Moe's best interests, particularly when it is undisputed that Sarah has failed to remedy the conduct or conditions that rendered Moe a child in need of aid.

Although the State's interest in fairness and accurate fact-finding is not served by the appearance of, or actual, judicial partiality, the child's best interests and

---

[48] *Dennis O. v. Stephanie O.*, 393 P.3d 401, 411 (Alaska 2017) (quoting *In re K.L.J.*, 813 P.2d at 280).

the particular facts here tip this third prong against Sarah: remand would unnecessarily lengthen judicial proceedings, jeopardizing permanency for a child who is finally healing after suffering trauma and mental injury in Sarah's care.

### D. Conclusion

The superior court's perceived lack of impartiality with respect to one issue in this case did not rise to the level of structural error or violate Sarah's due process rights. Although the court may have exhibited partiality related to whether substance abuse continues to substantially impair Sarah's ability to parent, her ability to "be heard" and "adequately represent [her] interests" with respect to the domestic violence and mental illness findings was not plausibly prejudiced by those limited exchanges.[49] Moe's best interests will not be served by delaying permanency and prolonging judicial proceedings in the face of uncontroverted factual findings that Sarah has yet to remedy the conduct or conditions that made him a child in need of aid.

## V. CONCLUSION

The superior court's decision terminating Sarah's parental rights is AFFIRMED.

---

[49] *In re K.L.J.*, 813 P.2d at 279 (quoting *Matanuska Maid, Inc. v. State*, 620 P.2d 182, 192 (Alaska 1980)).