WINFREE, Justice.
I. INTRODUCTION
A mother appeals the superior court's decision adjudicating her child as a child in need of aid, contending that the court relied in part on the record from her previous custody proceeding without giving her prior notice. The mother argues that by not giving her notice, the court violated her due process rights. Relying on cases involving judicial bias, she then claims that the superior court's due process violation warrants automatic reversal of the court's adjudication finding, or, alternatively, reversal on the basis that the error was not harmless.
We assume-without deciding-that the superior court violated the mother's due process rights, but we affirm the adjudication decision because she has failed to demonstrate that this alleged error was anything but harmless.
*276 II. FACTS AND PROCEEDINGS
A. Emergency Petition For Adjudication
In June 2017 Amy S.[1] took her son, Zoltan-age 11 and an Indian child under the Indian Child Welfare Act (ICWA)[2] -to a hospital emergency room. Zoltan was experiencing homicidal and suicidal ideation, and hospital doctors determined he met the criteria for admission. Jack, Zoltan's father, had legal custody, and Jack's consent was needed for medical treatment. Jack refused consent because he believed there was no private insurance coverage for the $2,000 per day treatment, and he wanted time to figure out how to pay for it. Zoltan nonetheless was admitted, and the Department of Health and Social Services, Office of Children's Services (OCS) filed an emergency petition for a child in need of aid (CINA) adjudication under AS 47.10.011(4)[3] and for temporary custody. OCS noted in its petition that Jack and Amy were involved in a "contentious" custody dispute and recounted some of OCS's history with the family, including 18 OCS reports filed against Jack and 5 against Amy. But OCS also noted that the vast majority of the reports were unsubstantiated.
B. Probable Cause Hearing
The superior court held a probable cause hearing over three days.[4] At the beginning of the hearing the court referenced its prior participation in the parents' child custody case, stating: "There's been a long, protracted custody dispute between the parties. Under House Bill 200, that's actually a good thing, because we can hear some of the issues involving [Zoltan] simultaneously in both of the cases."[5] On the hearing's third day, Jack agreed to stipulate that Zoltan was a child in need of aid under AS 47.10.011(8)[6] so that he could continue receiving psychological treatment in a therapeutic group home. Jack had not yet determined whether Zoltan would qualify for insurance if he were discharged from OCS's custody, and Jack thought it best Zoltan remain in OCS's custody to continue receiving treatment.
The court then found Zoltan to be a child in need of aid under subsection (8) based on Jack's stipulation, "allegations in [OCS's] petition and ... recent motion practice ... in the domestic relations case." The judge asserted: "I could make th[e] probable cause finding just by ... taking judicial notice of the domestic relations file and under HB 200, I can do that. I can take judicial notice of the domestic relations file, and I'm expected and truly required to take notice of that file."
C. Adjudication Hearing
The superior court held a contested adjudication hearing in September and November 2017. OCS presented testimony from several witnesses about Amy's conduct and its effect on Zoltan, and Amy called her therapist to testify on her behalf.
1. OCS's evidence
Zoltan's therapist expressed concern that Amy appears to rely on Zoltan for comfort *277 and that this could cause him difficulty building relationships later in life. Zoltan's caseworker shared this concern, testifying that she thought Amy was having "her emotional needs met by [Zoltan rather than] meeting his emotional needs." The caseworker also testified to concerns that, if Zoltan were returned to Amy's custody, Amy would be emotionally manipulative and encourage Zoltan to disengage from his father. The caseworker said that Amy had attempted to manipulate Zoltan while in his residential treatment facility by telling him that his dog was very sick and needed to be put down, when that was not true. This caused Zoltan to run away to try to see the dog. The caseworker also claimed that Amy talked to Zoltan on the phone while he was at school in violation of the facility's rules. The caseworker suspected that Zoltan's recent disengagement from phone calls with his father was the result of Amy's calls. In the caseworker's opinion, Amy's and Jack's inability to co-parent had directly contributed to Zoltan's mental health issues, and neither parent had taken steps to address the problem as of the adjudication hearing.
A mental health clinician testified about her experience supervising therapeutic visitation sessions between Zoltan and his parents. The clinician testified that, despite being asked by OCS not to discuss Zoltan's dog, Amy continued to discuss the dog during almost every visit. She testified that Amy once told Zoltan that, if he wanted, she would let him live with Jack. The clinician interpreted this as Amy trying to create a negative impression of Jack by implying that he does not respect what Zoltan wants. The clinician said that Amy struggled to take responsibility for her actions during their sessions together, instead focusing on things Jack had done wrong in the past. The clinician also said she heard Zoltan state that his father has a history of violence and that he knew this because Amy had told him. This statement was consistent with previous concerns that Amy had coached Zoltan to report abuse by his father.
A psychiatric nurse who supervised a visit between Zoltan and his parents when he was in the hospital testified that he made accusations against his father based on incidents that happened before Zoltan was born. When Amy was questioned about these accusations, she said that she could not control whether Zoltan read "documents" she had in the house. The nurse was concerned that Amy was telling Zoltan information about his father that he should not have been told.
A social worker OCS hired to write an expert report testified that she thought Amy and Zoltan had an "enmeshed relationship" and that Amy was alienating Zoltan from Jack. The expert report summarizes OCS's history with Zoltan dating back to 2009, Amy and Jack's custody case, and domestic violence protective order petitions Amy filed. The expert testified that protective services reports previously filed against Jack may have been "early signs" Amy was trying to alienate Zoltan from Jack. Her report states that there was evidence Amy may have coached Zoltan to report abuse by Jack. The expert testified that Amy's failure to comply with boundaries OCS set after assuming custody of Zoltan-by giving him gifts, having unauthorized phone calls, and sharing photos with him-set up an "unequal playing field" for Jack as the parent who complied with OCS's rules. The expert also testified that there was evidence Amy was encouraging Zoltan's negative feelings toward OCS.
2. Amy's evidence
Amy's therapist testified on her behalf. The therapist acknowledged that Amy had exhibited poor boundaries in her interactions with Zoltan in the past but said that Amy was making progress in therapy. The therapist testified that she had diagnosed Amy with adjustment disorder and major depressive disorder. The therapist gave conflicting answers when asked whether Amy could "safely parent" Zoltan. On direct examination the therapist testified that she thought Amy could safely parent Zoltan "[w]ith a little more parenting information and classes and practice." On cross-examination she clarified that "[a]s of today, I think [Amy] would be a safe parent" but that "I think [Amy] could be a better parent if she had more information as well."
*278 The superior court stated it was not giving Amy's therapist's testimony much weight for several reasons. The court was not convinced the therapist "ha[d] undertaken all of the steps that would be necessary to determine whether there [we]re any personality disorders at play." The court specifically asserted that the therapist had failed to conduct "paper and pencil testing, psychometric testing of [Amy] which is a standard part of the repertoire for comprehensive psychological evaluation." The court further noted that the therapist is not a clinical psychologist, may have a conflict as Amy's therapist, and gave equivocal answers when asked about Amy's ability to parent safely. The court also thought the therapist's opinion was "based on a limited amount of information," noting:
[T]he records that [the therapist] said she has reviewed did not include the very voluminous pleadings in the domestic relations case. I have been working with this family for 10 years. I don't claim to have the qualifications or the expertise of someone of [the therapist's] caliber, but I have a lot more factual information about this family than I suspect she does. And the legislature's told me to use that in House Bill 200.
3. The court's findings
The court issued oral findings at the close of the hearing. It concluded that Zoltan "is no doubt a child in need of aid [under subsection (8) ] because of mental injury that has been caused both by the inability of the parents to co-parent and by [Amy's] ongoing hatred and acrimony with respect to [Jack] that she has passed on to her son." The court noted that "the primary problem that has created such significant mental health problems for [Zoltan] is [Amy's] current inability and past inability to acknowledge that both [Jack] and [Amy] have an important role to play in parenting [Zoltan]."
The court pointed to two specific facts in support of its conclusions. First, it agreed with the conclusions contained in the expert's report, discussing in detail parental alienation and actions Amy had taken that could have resulted in such alienation. Second, the court also mentioned Amy's "porous boundaries," providing as an example the incident the mental health clinician recounted in which Amy told Zoltan that, if he wanted, she would let him live with Jack. The court referred to the comment as "a terrifying proposition" for Zoltan, because after years of Amy telling him that she was the safe parent, she was suggesting that she would "just abandon" him to Jack.
D. Amy's Motion For Findings Of Fact And Conclusions Of Law
In January 2018 Amy filed a motion requesting "findings of fact and conclusions of law made by th[e] court in support of the finding that [Zoltan was] a child in need of aid." She argued that the court did not specify which facts it relied on in support of its oral findings, as required by Alaska Civil Rule 52(a).[7] She contended it was clear that the court had in part relied on its knowledge of Jack and Amy's custody case and, other than Jack's attorney, the attorneys in the case were not "privy to those proceedings." Amy argued that the court appeared to have taken judicial notice of the custody case file and that the facts the court relied on from the custody file exceeded the permitted scope of judicial notice under Alaska Evidence Rule 201. OCS took no position on the motion.
In June the superior court issued a summary of the factual findings from Jack and Amy's custody case that informed its decision to adjudicate Zoltan as a child in need of aid. The summary does not discuss the CINA case; the court merely recounts some of the custody case proceedings that occurred between 2007 and 2017, briefly discussing the various pleadings, custody investigation reports, and oral and written findings. Almost none of the specific facts contained in the summary were referenced during the adjudication hearing.
Amy appeals the superior court's adjudication order on the basis that the court's consideration of facts from her custody case violated her procedural due process rights.
*279 She does not challenge any of the superior court's underlying factual findings.
III. STANDARD OF REVIEW
"Whether due process rights are violated in a CINA case is a question of law that this court reviews de novo, adopting 'the rule of law that is most persuasive in light of precedent, reason and policy.' "[8] Even if we conclude that an error has been committed, "[w]e must disregard harmless errors that have no substantial effect on the rights of parties or on the outcome of the case."[9]
IV. DISCUSSION
A. We Review Amy's Claim De Novo Because She Did Not Have An Opportunity To Raise It In The Superior Court.
OCS argues that Amy did not challenge the superior court's consideration of custody case information in the adjudication proceeding, despite the court giving her "ample notice of [its] intent to consider the custody file," and thus that we should consider Amy's argument only if we find plain error. We generally "will not consider arguments that were not raised below, unless the issues establish plain error, or the issues (1) do not depend upon new facts, (2) are closely related to other arguments at trial, and (3) could have been gleaned from the pleadings."[10] "[P]lain error exists in a CINA case where 'an obvious mistake has been made which creates a high likelihood that injustice has resulted.' "[11]
But "an objection is not required to preserve an issue for appeal if the appealing party had no opportunity to make an objection."[12] Under Alaska Civil Rule 46(f), "if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice the party." In Vent v. State the court of appeals applied Rule 46(f) and held that an applicant for post-conviction relief preserved a due process claim for appellate review because there had been no opportunity to object to the superior court's consideration of material outside the record.[13] The applicant did not discover that the judge had conducted independent research until the judge issued written findings.[14]
OCS points to four instances of the court referencing the custody file and argues that Amy should have objected following those references. The first two times the court mentioned the custody case, it was referring to (1) its ability to consider custody issues in the CINA case under AS 47.10.113 and (2) the fact that it could not facilitate a settlement conference between the parties because of its history with them. Neither example reflects an intent to use the custody file to determine whether Zoltan was a child in need of aid.
The court then referenced the custody case while making oral probable cause findings; the court made clear that it was taking judicial notice of and using the file-in conjunction with the allegations in the petition-to find that Zoltan was a child in need of aid. But taking judicial notice of the existence of ten years of custody disputes is different *280 than taking judicial notice of specific facts, pleadings, and testimony from the custody case; the latter action is what Amy challenges. Because the court's oral probable cause finding did not discuss the underlying facts of which notice was being taken, Amy had no adequate opportunity to object.
OCS also asserts that the court "made clear that [it] relied on the custody file" when making its oral adjudication findings. But the oral adjudication findings did not refer to specific facts from the custody case or indicate that the court was incorporating its probable cause findings at the adjudication hearing. And the court's later "summary of factual findings" reveals that it relied not only on the custody case file but also on domestic violence proceedings over which it did not preside and which had never been referenced at the hearing.
This case is analogous to Vent because, like that case's applicant for post-conviction relief, Amy did not discover the evidence the superior court relied on until it issued written findings.[15] Because Amy could not have raised her due process claim before the superior court, we hold that she preserved it for appellate review and we will consider it de novo.
B. Alaska Statute 47.10.113 Does Not Require The Superior Court In A CINA Case To Take Judicial Notice Of Matters From Previous Custody-Related Proceedings.
The superior court appears to have taken judicial notice of the custody case information included in its summary of factual findings because AS 47.10.113"required" it to consider that information when making its CINA findings. A statute requiring a court to consider particular evidence without first providing the parties notice and giving them an opportunity to respond to the evidence would raise constitutional due process concerns.[16] We thus examine the statute's text to determine whether the court's interpretation is correct.
Alaska Statute 47.10.113(a) provides that "a court shall hear a request to make, modify, or vacate an order for the custody of or visitation with a minor child in state custody under this chapter as part of the [CINA] proceedings relating to the child." The statute's imperative command is that a superior court must consider custody-related motions in a CINA proceeding, not that it has to take into account matters from past custody proceedings. The statute leaves unaltered CINA Rule 9(a), which provides that the Evidence Rules apply to adjudication hearings.
Legislative history suggests that the statute was intended as a procedural change to eliminate the requirement of bringing a separate action to determine child custody. There is no indication that the legislature intended to reduce or change applicable burdens of proof in a CINA case or to change the types of evidence that courts must consider. OCS's director testified that the law was intended "to streamline a number of different legal decisions that could impact a child in the state child welfare system."[17] Before the law was passed, "adoption, guardianship, and civil custody matters all happened in different courts, often with different judges and at different times, which often created redundancies and delays for the involved parties in the quest for permanency for the child."[18] The new law allowed "all the hearings [to] be conjoined under a CINA hearing" so that the judge hearing the case would "be [the] most informed and best equipped to provide a good judicial determination."[19] An assistant attorney general in the Department of Law's child protection section clarified that the *281 statute would not create new types of proceedings, but rather it would expand "the types of orders that the [CINA] judge would be able to issue."[20] The ICWA coordinator for Aleutian Pribilof Islands Association testified that the law would "eliminate complicated procedural barriers in the adoption process for children in custody so that Alaska Native families can be considered for adoption through the [CINA] proceedings instead of through an entirely different and convoluted proceeding held in Probate Court."[21] The chief operating officer of Cook Inlet Tribal Council expressed a similar sentiment.[22]
We note that although courts are not required to consider matters from past custody-related proceedings in a CINA case, they may do so if the information is offered in compliance with applicable evidence rules. For example, under Alaska Evidence Rule 201(b), a court may take judicial notice of facts "not subject to reasonable dispute" that are "(1) generally known within this state or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Court records, like the custody proceeding records in this case, may be judicially noticed to show "that a prior suit was filed, who the parties were, and so forth."[23] But contested factual findings contained in court records may be in dispute and generally are not the proper subjects of judicial notice.[24]
Even if information from a custody-related proceeding is not the proper subject of judicial notice, it still may be admitted into evidence in a CINA proceeding. For example, a parent's prior statements in a custody-related proceeding potentially could be used to impeach the parent's testimony in the CINA case.[25] A statement included in a parent's custody-related pleading or affidavit might be admissible as a party admission.[26] Or if a parent were "unavailable" within the meaning of Rule 804(a), prior testimony from a custody-related proceeding could be admitted if it met the requirements of Rule 804(b)(1).
C. Even Assuming Amy's Procedural Due Process Rights Were Violated, She Has Shown No Prejudice.
The right to procedural due process includes the right to "a reasonable opportunity to know the claims of the opposing party and to meet them."[27] Amy argues that the superior court denied her that right when it failed to give her notice of, and an opportunity to respond to, custody case facts the court relied on in adjudicating Zoltan as a child in need of aid. We assume, without deciding, that Amy is correct.
*282 But even if there were a due process violation in this case, we are not persuaded that Amy was harmed by it. Amy fails to make a plausible claim of prejudice.[28] She cites, but does not apply, the relevant due process test.[29] And after a careful reading of Amy's brief, we find only two statements conceivably relating to whether she was prejudiced by her inability to contest the custody case evidence. She claims that the superior court "discounted the testimony of Amy's expert witness based on information outside the record" and that the court "drew inferences against Amy based on ... un-noticed facts."
Neither claim is sufficient to raise a "plausible" claim of prejudice.[30] The superior court discounted Amy's therapist's testimony for several reasons having nothing to do with evidence outside the record. The court noted that the therapist had failed to conduct "standard" psychometric testing, had an inherent conflict of interest based on her relationship with Amy, and gave equivocal answers when asked about Amy's ability to safely parent Zoltan. Even if the court had not discounted the therapist's testimony, it is unclear that the testimony actually was helpful to Amy's case. The therapist initially seemed to imply that Amy could only safely parent Zoltan "[w]ith a little more parenting information and classes and practice." And Amy has not explained what "inferences" the court allegedly drew against her or how those inferences affected the court's adjudication or removal decision.[31]
Amy also does not explain what information in the superior court's summary of findings led the court to discount her expert's testimony or make any alleged inferences against her. This is important because Amy has not brought general claims of judicial bias or violating relevant evidentiary rules. She alleges that her due process rights were violated because of her lack of notice of and inability to respond to specific pieces of evidence on which the superior court relied. It follows that she must explain how having notice of and an opportunity to respond to that evidence might have changed the outcome in her case. She has failed to do so. Amy instead appears to allege that the court's references to its ten-year history with the parents were improper, without explaining how those references impacted the court's decision. Because the court's general comments do not implicate Amy's rights to notice and an opportunity to respond to specific evidence, we do not consider them relevant in the context of this appeal.
Amy has not challenged the superior court's underlying factual findings or identified *283 any finding she believes tainted by considering evidence outside the record. She ignores that the court referenced only specific evidence from the adjudication proceeding when making its oral findings-namely, the expert's report, the therapist's reference to Amy's "porous boundaries," and the incident the mental health clinician recounted when Amy told Zoltan that if he wanted to, she would let him live with Jack. Because Amy has raised only "a theoretical possibility of prejudice,"[32] we hold that any due process violation in this case was harmless error.[33]
V. CONCLUSION
The superior court's adjudication order is AFFIRMED.

We use pseudonyms to protect the parties' privacy.

See 25 U.S.C. § 1903(4) (2012) (defining "Indian child").

AS 47.10.011(4) provides that a "court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child ... is in need of treatment for mental injury and the child's parent ... has knowingly failed to provide the treatment."

See AS 47.10.142(e) ("When the temporary custody hearing is held, the court shall determine whether probable cause exists for believing the child to be a child in need of aid....").

This appears to reference AS 47.10.113, which became effective in January 2017. See Enrolled House Bill (H.B.) 200, 29th Leg., 2d Sess. (2016) §§ 7, 22. Alaska Statute 47.10.113 provides that, "[e]xcept as provided in AS 25.24.150(a), a court shall hear a request to make, modify, or vacate an order for the custody of or visitation with a minor child in state custody under this chapter as part of the [CINA] proceedings relating to the child."

Alaska Statute 47.10.011(8) allows the court to find a child to be a child in need of aid if it finds, by a preponderance of the evidence, that "conduct by or conditions created by the parent ... have ... resulted in mental injury to the child ... or placed the child at substantial risk of mental injury as a result of [specific types of parental behavior]."

Rule 52(a) provides: "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon."

Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 264 P.3d 842, 846 (Alaska 2011) (quoting Jeff A.C., Jr. v. State , 117 P.3d 697, 702 (Alaska 2005) ).

See Luther v. Lander , 373 P.3d 495, 499 (Alaska 2016) (quoting Pedersen v. Blythe , 292 P.3d 182, 184 (Alaska 2012) ); see also Alaska R. Civ. P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."); CINA Rule 1(e) (providing that Civil Rule 61 applies to CINA proceedings).

Hoffman Constr. Co. of Alaska v. U.S. Fabrication & Erection, Inc. , 32 P.3d 346, 351 (Alaska 2001).

State, Dep't of Health &Soc. Servs., Office of Children's Servs. v. Michelle P. , 411 P.3d 576, 586 (Alaska 2018) (alteration in original) (quoting Kyle S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 309 P.3d 1262, 1267 (Alaska 2013) ).

Vent v. State , 288 P.3d 752, 755 (Alaska App. 2012).

See id. at 756.

Id. at 755.

See id.

See Sarah A. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 427 P.3d 771, 778 (Alaska 2018) ("The crux of due process is [having the] opportunity to be heard and the right to adequately represent one's interests." (quoting Dennis O. v. Stephanie O. , 393 P.3d 401, 406 (Alaska 2017) (alteration in original))).

Minutes, House Health & Soc. Servs. Comm. Hearing on H.B. 200, 29th Leg., 1st Sess. 3:06-3:14 (Mar. 29, 2016) (testimony of Christy Lawton, Director of OCS), http://www.legis.state.ak.us/PDF/29/M/HHSS2016-03-291503.PDF.

Id.

Id.

Minutes, Sen. Jud. Comm. Hearing on H.B. 200, 29th Leg., 2d Sess. 4:134:17 (May 25, 2016) (testimony of Carla Erickson, Assistant Att'y Gen.), http://www.legis.state.ak.us/PDF/29/M/SJUD2016-05-251541.PDF.

Minutes, House Health & Soc. Servs. Comm. Hearing on H.B. 200, 29th Leg., 1st Sess. 6:27-6:31 (Mar. 29, 2016) (testimony of Amanda McAdoo, ICWA Coordinator, Aleutian Pribilof Islands Ass'n., Inc.), http://www.legis.state.ak.us/PDF/29/M/HHSS2016-03-291806.PDF.

Minutes, House Jud. Comm. Hearing on H.B. 200, 29th Leg., 1st Sess. 1:42-1:45 (Apr. 12, 2016) (testimony of Cristy Willer, COO of Cook Inlet Tribal Council), http://www.legis.state.ak.us/PDF/29/M/HJUD2016-04-121307.PDF (stating that the law "removes barriers for Alaska Native families who want to adopt ... children who are connected to them by family or tribal membership").

F.T. v. State , 862 P.2d 857, 864 (Alaska 1993).

See id. ; accord Lee v. City of Los Angeles , 250 F.3d 668, 689-90 (9th Cir. 2001) (holding it was error to take judicial notice of contested facts in public court records); 21B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 5106.4 (2d ed. 1987) (stating most courts have held it improper under Federal Rules of Evidence to take judicial notice of factual findings from previous cases).

See Alaska R. Evid. 613(a) ("Prior statements of a witness inconsistent with the testimony of the witness at a trial, hearing or deposition[ ] ... are admissible for the purpose of impeaching the credibility of a witness.").

See Alaska R. Evid. 801(d)(2)(A) ("A statement is not hearsay if ... [t]he statement is offered against a party and is ... the party's own statement....").

Gonzales v. United States , 348 U.S. 407, 414 n.5, 75 S.Ct. 409, 99 L.Ed. 467 (1955) (quoting Morgan v. United States , 304 U.S. 1, 18, 58 S.Ct. 773, 82 L.Ed. 1129 (1938) ).

See Sarah A. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 427 P.3d 771, 780 (Alaska 2018) ("We have denied due process claims where a parent failed to identify any 'plausible' basis for finding prejudice or did not theorize about how the requested procedural safeguard might 'potentially alter[ ] the findings about ... parental conduct.' " (quoting D.M. v. State, Div. of Family &Youth Servs. , 995 P.2d 205, 210-11, 213 (Alaska 2000) )).

This court considers the factors set out by the United States Supreme Court in Mathews v. Eldridge , 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to determine what process is due:
First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and, the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
Sarah A. , 427 P.3d at 778 (quoting D.M. , 995 P.2d at 212 ).

See id. at 780 (quoting D.M. , 995 P.2d at 210 ).

We note that it is acceptable for a judge to have an opinion of a party as a result of something learned in an earlier proceeding, provided that the judge still can act as an impartial arbiter. See Liteky v. United States , 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."); Hanson v. Hanson , 36 P.3d 1181, 1184 (Alaska 2001) (noting judicial opinion formed during previous proceedings will not ordinarily support bias challenge unless opinion "is so extreme as to display clear inability to render fair judgment" (quoting Liteky , 510 U.S. at 551, 114 S.Ct. 1147 )).

See Sarah A. , 427 P.3d at 779 (quoting D.M. , 995 P.2d at 212 ).

We reject Amy's contention that we should apply harmless error tests adopted by courts in cases involving judicial bias. Amy has not asserted in this appeal that there was judicial bias or that the trial judge should have recused.