NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) Supreme Court No. S-16885 |
| DUANE M. | ) ) Superior Court No. 3AN-17-02476 PR ) ) MEMORANDUM OPINION ) AND JUDGMENT[*] ) ) No. 1757 – March 11, 2020 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Rachel E. Cella, Assistant Public Defender, and Beth Goldstein, Acting Public Defender, Anchorage, for Duane M. Laura Fox, Senior Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for State of Alaska.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I.   INTRODUCTION

A man appeals a 30-day order committing him involuntarily for mental health treatment at Alaska Psychiatric Institute (API). He argues that his right to due process was violated because the commitment order states that the superior court's findings were based in part on the initial petition for evaluation and its attachments, which had not been admitted into evidence. He also contends that the evidence presented

---

[*]   Entered under Alaska Appellate Rule 214.

at the hearing was insufficient to support the superior court's findings that he was gravely disabled as a result of mental illness and that there was no less restrictive alternative for his treatment. We conclude, however, that any evidentiary error was harmless, that the superior court's findings were not clearly erroneous, and that the findings satisfy the statutory criteria. We therefore affirm the commitment order.

## II. FACTS AND PROCEEDINGS

Duane M.,[1] who was 63 years old during the relevant proceedings, suffers from a severe alcohol use disorder and historical diagnoses of bipolar disorder and Wernicke-Korsakoff syndrome, a type of alcohol-related brain damage that affects heavy drinkers' memories. In September 2017 Duane's family became especially concerned for his well-being, and Duane's sister filed a petition asking the court to order a 72-hour involuntary hospitalization for a psychiatric evaluation.[2] The superior court granted the petition. Duane was hospitalized at API, and two days later a psychiatrist and a nurse practitioner filed a petition to commit him for up to 30 days, alleging that he was gravely disabled as a result of mental illness.[3]

A commitment hearing was held before a magistrate judge. Duane's adult daughter testified that she did not think Duane would be safe if he were released from API. She described text messages and phone calls from Duane indicating that he was afraid for his life; for example, he worried that he would forget to turn off the oven or that he would die of hypothermia because he forgot to come in from the cold. She testified that Duane talked about hallucinations, had "manic and depressive episodes"

---

[1]  We use a pseudonym to protect Duane's privacy.

[2]  *See* AS 47.30.705-.725 (setting out procedures for emergency detention for evaluation).

[3]  *See* AS 47.30.730 (governing petitions for 30-day commitment).

during which he was unable to sleep, talked rapidly and incessantly, and made bad, impulsive decisions. She testified that Duane's bipolar disorder, Wernicke-Korsakoff syndrome, and alcohol abuse all contributed to his behavior. She testified that Duane wanted her and her brother to look into renting a room for him but she did not believe anyone would be able to live with him because of his bad habits and health issues. She testified that when she last saw her father he was "scared about . . . his future" and contemplating sleeping at a homeless shelter.

Duane's adult son was serving as Duane's legal guardian at the time of the hearing and, like his sister, testified that Duane was unable to care for himself. Duane had been living in a motel and had another two weeks paid for, but his son considered this living situation unsafe because when Duane was in a "confused or desperate or drunken or delusional state of mind" he would invite strangers in off the street. The son testified that he had been looking for months for somewhere more permanent for his father to live but it was difficult to find a place where he would not disturb the other residents. He testified that Duane had recently been evicted from two housing arrangements, including a senior living program, for drinking and making a disturbance, and he was now "one step away" from homelessness.

Duane's son also testified that he had been trying to get his father into various substance abuse treatment programs, but most of them were not equipped to deal with Duane's mental and physical health conditions. He testified that the family had become especially worried recently because Duane was "losing control" and in "a dangerous place." He testified that he was attempting to dissolve the guardianship because he was unable to keep his father safe and the responsibility was taking a toll on his own health.

Dr. Kahnaz Khari was Duane's psychiatrist at API during his hospitalization for evaluation. She diagnosed him with an unspecified mood disorder, a severe alcohol use disorder, and — based on previous diagnoses — histories of bipolar disorder and Wernicke-Korsakoff syndrome. She did not personally observe any symptoms of the two historical diagnoses over Duane's two days of evaluation. She testified that it was "challenging" to determine whether he had mental health issues separate from his drinking problem; symptoms of either one could include racing thoughts, irritability, anger, and irrational decision-making. But given Duane's mental health history, she testified that he "probably" had a thought disorder like bipolar and that he would benefit from inpatient treatment. She believed that inpatient treatment would be more promising than outpatient treatment because of Duane's high risk of alcohol relapse and the potentially fatal health risks associated with alcohol withdrawal. When asked, Dr. Khari agreed that her concern was that if Duane began drinking again — which she considered to be very likely — the mood disorder and the drinking would combine and cause him to return to the "position that he was in . . . when he was sending these repeated texts to his family of both threatening harm to others and himself."

At the conclusion of the commitment hearing, the magistrate judge found Duane gravely disabled as a result of mental illness. Noting Duane's "severe alcohol problem," the magistrate judge also recognized that alcoholism is not a per se mental illness under the commitment statute.[4] But the magistrate judge could not "get past the extensive history" of mental illness provided by the family's hearing testimony and the petition for hospitalization for evaluation.

---

[4]     *See* AS 47.30.915(14) (defining "mental illness" and stating that "alcoholism do[es] not per se constitute mental illness").

The magistrate judge prepared a proposed 30-day commitment order. The proposed order stated that "[Duane's] mental illness is exacerbated by his excessive alcohol abuse, but remains the primary factor contributing to his need for hospitalization in a psychiatric facility." The proposed order further stated that its factual findings were drawn from the hearing testimony and from "the sworn statements in the initial Petition for Hospitalization filed on September 14, 2017 and the documentation attached thereto (including the written statements of family members)."

Duane filed objections to the proposed commitment order. He argued that the magistrate judge improperly relied on information contained in the petition for hospitalization for evaluation, which had not been admitted into evidence. Duane also objected to the magistrate judge's findings that Duane was suffering from a mental illness, that he was gravely disabled, and that API was the least restrictive alternative.

The superior court signed the 30-day commitment order, adopting the magistrate judge's written findings and adding a handwritten note that it had reviewed the matter de novo as required by Alaska Civil Rule 53(d)(2)(B). The court made no other modifications to the order. Duane appeals.

## III.   STANDARD OF REVIEW

" 'Factual findings in involuntary commitment . . . proceedings are reviewed for clear error,' and we reverse those findings only if we have a 'definite and firm conviction that a mistake has been made.' "[5] Whether those factual findings

---

[5]     *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016) (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019)).

comport with statutory requirements is a question of law we review de novo.[6] "We apply our independent judgment to the interpretation of the Alaska Constitution and the mental health commitment statutes."[7] "[W]e will review de novo the superior court's decisions and use our independent judgment to determine whether, based on the underlying factual findings made by the superior court, there was clear and convincing evidence that involuntary [commitment] was in [respondent's] best interests and was the least intrusive available treatment."[8]

## IV. DISCUSSION

### A. The Superior Court's Consideration Of Unadmitted Evidence Was Harmless Error.

The factual findings in the 30-day commitment order, as proposed by the magistrate judge and adopted by the superior court, begin with the statement that "[t]he following facts/findings are drawn from the sworn statements in the initial Petition for Hospitalization filed on September 14, 2017 and the documentation attached thereto (including the written statements of family members)," in addition to the hearing testimony of Dr. Khari and Duane's two children. The petition and its attachments were never admitted into evidence at the hearing. Duane argues that the court's reliance on

---

[6] *Wetherhorn*, 156 P.3d at 375.

[7] *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 837 (Alaska 2014).

[8] *In re Hospitalization of Luciano G.*, 450 P.3d 1258, 1262 (Alaska 2019) (alterations in original) (quoting *In re Hospitalization of Lucy G.*, 448 P.3d 868, 878 (Alaska 2019); *see also Lucy G.*, 448 P.3d at 878, n.53 (stating that although the best interests answer "must be fully informed by medical advice received with appropriate deference, in the final analysis the answer must take the form of a legal judgment that hinges not on medical expertise but on constitutional principles aimed at protecting individual choice" (quoting *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 250 (Alaska 2006))).

this evidence therefore violated his right to due process. He contends that he was "prejudiced by the superior court's approach" because he "was not afforded a fair opportunity to challenge information used to commit him."

A court's involuntary commitment decision must be based on evidence admitted pursuant to the Alaska Rules of Evidence.[9]  Because the petition and its attachments were never admitted, the court could not properly rely on them in reaching its decision to commit Duane.  If the magistrate judge relied on these materials — as the order states — it was legal error.[10]

When signing the proposed commitment order, the superior court added a handwritten note that it had reviewed the matter de novo.[11]  The State argues that the superior court's de novo review mooted any error in the magistrate judge's improper reliance on the petition.  But the superior court did not change the wording of the commitment order to correct the problem; as signed by the court, the order continues to state that it relies on the petition and its attachments, repeating the original error.

---

[9]     *See Diego K. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 411 P.3d 622, 629 (Alaska 2018) (holding that despite informality of procedures used in Child in Need of Aid cases, when hearing's focus requires court to make specific factual findings and legal conclusions, court's decision must be based only on evidence admitted pursuant to Alaska Rules of Evidence); *Paula E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 276 P.3d 422, 430 (Alaska 2012) (explaining that unadmitted exhibits, even if included in record on appeal, "are to be afforded no weight" because parties have no opportunity to challenge and respond to them).

[10]     *See Diego K.*, 411 P.3d at 629-30.

[11]     *See* Alaska R. Civ. P. 53(d)(2)(B) ("[I]f any party files objections to [a master's] report, the court . . . must consider under a de novo standard of review all objections to findings of fact made or recommended in the report, and must rule on each objection.").

"Involuntary commitment implicates Alaska's constitutional guarantees of individual liberty and privacy and therefore entitles the respondent to due process protections."[12]  We assume for purposes of our decision today that due process was violated by the court's reliance on information not admitted into evidence.

With that assumption, however, we must also consider whether Duane was prejudiced by the due process violation.  In the recent case of *Amy S. v. State, Department of Health & Social Services, Office of Children's Services*, we assumed that the superior court had violated the mother's procedural due process rights when it adjudicated her son as a child in need of aid by relying, in part, on information from a related custody case, information the mother had no opportunity to rebut in the subsequent adjudication proceeding.[13]  We determined, however, that even assuming a due process violation, the mother "fail[ed] to make a plausible claim of prejudice."[14]

The mother claimed she was prejudiced in two ways:  the superior court used information from the custody case to discount the expert testimony of the mother's therapist, and the court "drew inferences against [the mother] based on . . . un-noticed facts."[15] But we concluded that both claims were implausible.  First, "[t]he superior court discounted [the mother's] therapist's testimony for several reasons having nothing to do

---

[12]     *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 379 (Alaska 2007) (citations omitted), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019).

[13]     440 P.3d 273, 278, 281 (Alaska 2019).

[14]     *Id.* at 282.

[15]     *Id.* (alteration in original) (quoting appellant's brief).

with evidence outside the record."[16]  Second, the mother failed to explain "what 'inferences' the court allegedly drew against her" from the unadmitted information "or how those inferences affected the court's adjudication or removal decision."[17]

A similar analysis in this case leads us to a similar result.  Although the commitment order states that its findings were "drawn from" the petition and its attachments as well as the witness testimony, what follows is in fact drawn almost entirely from the witness testimony.  The first of the order's three paragraphs of factual findings states that this was Duane's fourth hospitalization at API; that he was diagnosed with bipolar disease in 1989 and Wernicke-Korsakoff syndrome in 2016; that he was not currently exhibiting bipolar symptoms, likely because of his medication; and that Dr. Khari had diagnosed him with a mood disorder.  All of this information appears in Dr. Khari's hearing testimony.

The commitment order's next paragraph describes Duane's current condition from the perspective of his children, specifically referencing their hearing testimony about his deteriorating mental health and difficulties with day-to-day living.  The one sentence that may be drawn at least in part from the unadmitted petition's attachments is this:  "[Duane] has sent numerous texts to his daughter stating that he wishes to end his life and/or harm others."  A number of such texts were attached to the petition.  Duane's daughter testified at the hearing that Duane's texts showed he was "scared for his life," but she referred to his fear of dying of hypothermia or other neglect

---

[16]    *Id.*

[17]    *Id.*; *see also Wendell C. II v. State, Office of Children's Servs.*, 118 P.3d 1, 4-5 (Alaska 2005) (affirming termination of parental rights supported in part by unadmitted social science studies when "there was no reasonable likelihood that these references changed any part of the result . . . because the superior court made so many other specific findings, based on admissible evidence, that were sufficient to" support termination).

of his own well-being, not intentional self-harm or harm to others. Dr. Khari's testimony, however, characterized the texts as involving threats of self-harm and harm to others and relayed that she had discussed them with Duane.[18] As an expert witness she was entitled to rely on the texts even if they had not been introduced into evidence,[19] and the court, in turn, could rely on her testimony about their nature.

The order's third paragraph of factual findings discusses Dr. Khari's views on the necessity for hospitalization. The discussion explicitly attributes the findings to Dr. Khari's hearing testimony; none of the referenced information can be found in the petition for evaluation or its attachments.

In sum, although it was error for the court to consider evidence that had not been admitted, the court's findings have their basis in the admitted testimony. As in *Amy S.*, we therefore conclude that any due process violation resulting from the evidentiary error in this case was harmless.[20]

## B. The Superior Court Did Not Clearly Err In Finding By Clear And Convincing Evidence That Duane Was Mentally Ill.

A 30-day commitment order requires a finding, "by clear and convincing

---

[18]   Dr. Khari noted, without objection, the statements in the petition that Duane had "been threatening and showing aggressive behaviors." She testified that she had asked Duane about "multiple texts . . . making threatening statement[s] and also making a statement . . . to end his life, kind of feeling hopeless," and that he told her that "those are not now, he's not suicidal at this time." The court later asked Dr. Khari whether releasing Duane would "place him back in a position that he was in . . . when he was sending these repeated texts to his family of both threatening harm to others and himself"; she answered, "Yes."

[19]   *See* Alaska R. Evid. 703 (explaining that experts may rely on facts or data not otherwise admissible, as long as they are of the type reasonably relied upon by experts in the field).

[20]   *See* 440 P.3d at 283.

evidence, that the respondent is mentally ill and as a result is likely to cause harm to the respondent or others or is gravely disabled."[21] "Evidence is clear and convincing if it produces 'a firm belief or conviction about the existence of a fact to be proved.' "[22] " '[M]ental illness' means an organic, mental, or emotional impairment that has substantial adverse effects on an individual's ability to exercise conscious control of the individual's actions or ability to perceive reality or to reason or understand . . . ."[23] The definition of mental illness explicitly excludes alcoholism;[24] mental illness that justifies involuntary commitment must be "apart from, and more than," the respondent's addiction.[25]

Challenging the superior court's finding that he was mentally ill, Duane argues that the diagnoses of bipolar disorder and Wernicke-Korsakoff syndrome were "historical" and that the only contemporary mental illness diagnosis, made by Dr. Khari, was of a mood disorder, which by itself was not causing him serious impairment. Duane observes that Dr. Khari's "main concern for [him] was his risk of alcohol relapse, not his mood disorder."

Dr. Khari described her diagnosis as follows: "Korsakoff syndrome, history of, and bipolar I disorder, current episode manic, history of. But myself, I put mood disorder, unspecified, and then also . . . rule out unspecified alcohol related

---

[21]     AS 47.30.735(c).

[22]     *In re Hospitalization of Luciano G.*, 450 P.3d 1258, 1262-63 (Alaska 2019) (quoting *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1193 (Alaska 2013)).

[23]     AS 47.30.915(14).

[24]     *Id.* ("[A]lcoholism do[es] not per se constitute mental illness, although persons suffering from th[is] condition[] may also be suffering from mental illness.").

[25]     *See E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1109 (Alaska 2009).

disorder," which she labeled as "severe." She testified that Duane was not currently presenting the symptoms she would expect with a bipolar disorder: "He is not showing elevated moods, grandiose delusions, psychotic symptoms, disability, and anger and agitation," though she attributed this to the anti-psychotic medication he was taking. She testified that he admitted having experiences with "racing thoughts," irrationality, and an inability to sleep when he has been drinking heavily. Throughout Dr. Khari's testimony her concerns with Duane's history of mental illness were interwoven with her concerns about his alcoholism, but her basic concern appeared to be that heavy drinking would exacerbate whatever "thought disorder like bipolar" he was suffering from, with possibly fatal results. She confirmed the superior court's interpretation of her testimony: that her concern that Duane would relapse into irrationality and harmful conduct stemmed from "the depressive disorder that [she had] diagnosed him with combined with . . . the drinking." Based on Dr. Khari's testimony, the court found that Duane was mentally ill.

We will not overturn the court's factual findings as clearly erroneous unless we are "left 'with a definite and firm conviction that a mistake has been made.' Conflicting evidence is generally insufficient to overturn a fact[ual] finding, and we will not reweigh evidence if the record supports the court's finding."[26]

Here, although Dr. Khari did not clearly differentiate the symptoms of Duane's mental illness from those of his alcoholism, the evidence supported a finding that he had a distinct mental illness. Duane's past diagnoses, his prior hospitalizations, his taking of anti-psychotic medication, and Dr. Khari's diagnosis of a mood disorder were consistent with this finding. It was also supported by the testimony of Duane's

---

[26] *In re Hospitalization of Jacob S.*, 384 P.3d 758, 765-66 (Alaska 2016) (quoting *In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011)).

children. When asked to explain Duane's "mental health problems . . . that are separate from a drinking issue," his daughter described him as having hallucinations and engaging in manic behavior like "the inability to sleep . . . enough, talking a lot, really quickly, really fast, making bad decisions, . . . impulsive decisions." Duane's son testified that Duane's condition is "exacerbated by drinking," and "when he drinks, it's not like a normal person becoming drunk," but rather it is "bizarre. It can be aggressive. It can be scary." We conclude that the court did not clearly err in finding that Duane suffered from a mental illness "apart from, and more than," his alcoholism.[27]

### C. The Superior Court Did Not Clearly Err In Finding By Clear and Convincing Evidence That Duane Was Gravely Disabled.

Under AS 47.30.915(9) there are two bases on which to find a grave disability. The superior court relied on subsection (B), which provides that a person is "gravely disabled" if the person, as a result of mental illness, "will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently."[28] The distress must be such that the person is "so unable to function that he or she cannot exist safely outside an institutional framework due to an inability to

---

[27] *See E.P.*, 205 P.3d at 1109.

[28] AS 47.30.915(9)(B) (defining "gravely disabled").

respond to the essential demands of daily life."[29] And the grave disability must be as a result of mental illness, not alcohol abuse.[30]

Duane challenges the superior court's finding that he was "gravely disabled" as a result of his mental illness. He argues both that he was not severely distressed and that any incapacity was not sufficiently tied to his mental illness as opposed to his alcohol abuse. Again, however, we conclude that the court did not clearly err in its finding.

There is significant evidence that Duane was severely distressed. His family's action in seeking his commitment was prompted by their fear that he was "losing control," as illustrated by his concerning text messages and fear for his life. For his own safety he needed reminders to turn off the oven and to come in from the cold. His son testified that Duane would lose control when given "complete freedom to follow his impulses" and that other times Duane worried about his health and asked to be brought to the hospital. Duane's children did not believe he would be safe if released from API without treatment.

Duane's children also testified that his current housing situation — a motel room — was unsafe. Duane was not only afraid of dying through some act of self-neglect, he was also in danger of predation by strangers. He had recently been evicted from two other housing arrangements and was contemplating homelessness. His daughter testified that Duane struggled financially because he spent his money fueling

---

**29** *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 376 (Alaska 2007), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019).

**30** *See* AS 47.30.735(c) (allowing involuntary commitment when the court "finds . . . that the respondent is mentally ill and as a result . . . is gravely disabled"); AS 46.30.915(4) (defining "mental illness" to exclude alcoholism).

his addictions. This evidence supports the finding that Duane was "so unable to function that he . . . cannot exist safely outside an institutional framework due to an inability to respond to the essential demands of daily life"[31] and was thus "severely disabled."

The evidence also supports the conclusion that Duane's severe distress resulted from both his alcoholism *and* his mental illness. Duane's daughter testified that her father's bipolar disorder, Wernicke-Korsakoff syndrome, and substance abuse all played a role in his behavior and decision-making. Duane's son testified that Duane became "more coherent when his condition [was] not exacerbated by drinking." Dr. Khari was concerned that without a longer stay at API, Duane was at a high risk of relapsing into heavy drinking, which, combined with his mental illness, would put him into a dysfunctional state. The record supports the conclusion that Duane's grave disability was a result of his mental illness.

**D.      The Superior Court Did Not Clearly Err In Finding By Clear And Convincing Evidence That Duane's Condition Could Be Improved By Hospitalization.**

Under AS 47.30.730, the petition for a 30-day commitment must "allege with respect to a gravely disabled respondent that there is reason to believe that the respondent's mental condition could be improved by the course of treatment sought."[32] This allegation must be proven by clear and convincing evidence.[33] Duane argues that

---

[31]     *See Wetherhorn*, 156 P.3d at 376.

[32]     AS 47.30.730(a)(3).

[33]     *In re Hospitalization of Darren M.*, 426 P.3d 1021, 1030-31 (Alaska 2018).

there was insufficient evidence to find that his condition would improve with hospitalization.[34]

Although Dr. Khari testified that it was "a little challenging" to identify the anticipated improvements of further hospitalization, she testified that the benefit of a longer stay was a longer period of sobriety, which in turn would increase the chance that Duane would agree to inpatient treatment for substance abuse. Given Duane's long history of serious alcohol abuse and high risk of relapse, Dr. Khari feared that Duane's mental condition would be exacerbated by his alcohol abuse if he were released prematurely. We conclude that the superior court did not clearly err when it found that Duane's alcohol abuse had to be addressed if his mental illness was going to be successfully treated, and that further hospitalization was therefore likely to improve his mental condition.

**E. The Superior Court Did Not Err In Finding By Clear And Convincing Evidence That There Was No Less Restrictive Alternative To Confinement.**

Duane also appeals the superior court's finding that there was no less restrictive alternative to confinement at API. He argues that the record does not support this finding and that the court should have required a "showing of the efforts API made to assess the adequacy of the resources already in place."

"The petitioner in an involuntary commitment proceeding must prove by clear and convincing evidence that there is no less restrictive alternative to

---

[34] *See* AS 47.30.730(a)(3) (requiring a petition for 30-day commitment to allege that there is reason to believe a gravely disabled respondent's mental condition "could be improved by the course of treatment sought"); *see also E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1108 (Alaska 2009) (discussing AS 47.730(a)(3)).

confinement."[35]  "Least restrictive alternative" is defined by statute to mean treatment facilities and conditions "that are no more harsh, hazardous, or intrusive than necessary to achieve the treatment objectives of the patient" and that "involve no restrictions on physical movement nor supervised residence or inpatient care except as reasonably necessary for the administration of treatment or the protection of the patient or others from physical injury."[36]

The finding of grave disability "presupposes an inability to 'live safely outside of a controlled environment.' "[37] This presupposition had substantial support in the hearing testimony, as already described above.  Dr. Khari testified that Duane was at a high risk of relapse, and she feared he would begin drinking and deteriorate, perhaps fatally, if released before an extended period of sobriety.  There were no apparent alternatives to API as the place where that extended period of sobriety could occur.  At the time of the hearing, Duane had a place to live outside API for only another two weeks, after which his housing situation was uncertain despite his family's efforts to find him a place to stay.  His children, though supportive, could only do so much to ensure his safety and had lost confidence in their ability to cope with his impulsive behavior.  His son testified that they had tried getting Duane admitted into various substance abuse treatment programs and "different housing options," but "most of them conclude[d] that

---

[35]     *In re Hospitalization of Luciano G.*, 450 P.3d 1258, 1265 (Alaska 2019); *In re Mark V.*, 375 P.3d 51, 59 (Alaska 2016) ("Finding that no less restrictive alternative exists is a constitutional prerequisite to involuntary hospitalization.").

[36]     AS 47.30.915(11).

[37]     *In re Hospitalization of Connor J.*, 440 P.3d 159, 166 (Alaska 2019) (quoting *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1195 (Alaska 2013)).

they are not equipped to deal with . . . his combination of . . . mental conditions and physical health conditions."

We conclude that the court did not err in finding that there was no less restrictive alternative to the requested commitment at API.

## V.    CONCLUSION

We AFFIRM the superior court's commitment order.